IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| GAMMILL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:24-CV-03055-BCW |
| | ) | |
| DOUGLAS B. CARTWRIGHT, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Plaintiff Gammill, Inc.'s motion for temporary restraining order. (Doc. #6). The Court, being duly advised of the premises, and having considered the briefing and the parties' arguments at oral argument on April 23, 2024, denies said motion.

## BACKGROUND

Plaintiff Gammill, Inc. ("Gammill") designs, manufactures, and markets longarm quilting machines (the "Machine") to a mix of individual customers and small, craft-oriented businesses across the United States. Additionally, Gammill provides other services such as retrofitting manual Gammill Machines or upgrading the computerized system on an older model. New Machines cost anywhere between $15,000 and $55,000. Because longarm quilting machines last about 40 years, customers typically buy just one in their lifetime.

Defendants Doug and Heather Cartwright (collectively, "the Cartwrights") are a married couple from Idaho. Defendant Everything Longarm, LLC, the Cartwrights' business, also sells longarm quilting machines.

1

### A. Gammill's nondisclosure agreements with the Cartwrights

In early 2018, the Cartwrights formed Highland Gammill, LLC ("Highland Gammill") and entered in to dealership agreement with Gammill to be the exclusive seller of Gammill's products in Idaho, Montana, and Wyoming. In June of 2021, the owners of Gammill, Michelle and Andrew Weaver (the "Weavers"), approached the Cartwrights to discuss Gammill's new business model. Before disclosing the plans, the Weavers asked the Cartwrights to sign nondisclosure agreements ("NDAs").

Douglas Cartwright ("D.C.") and Heather Cartwright ("H.C") signed NDAs (the "Agreements") which prohibited them from: (1) disclosing to any person or entity or copying Gammill's confidential information (which expressly includes, but is not limited to, trade secrets, product ideas, contracts, financial information, pricing structure, discounts, sales leads, strategic alliances, partners, and customer and client lists and information) without the prior, written consent of Gammill and (2) attempting to do business with, or otherwise soliciting, any business contacts found or otherwise referred by Gammill, without Gammill's written approval, for a period of 10 years after the end of the term of the Agreements. (Doc. #1-2). The Agreements also required the Cartwrights to: (1) promptly advise Gammill of any possible unauthorized disclosure or use of its confidential information, and (2) return all materials containing Gammill's confidential information within five days of receipt of a written request from Gammill.

Additionally, the Agreements provide that if it appears the Cartwrights disclosed or threatened to disclose Gammill's confidential information, Gammill would be entitled to an injunction to restrain them from disclosing the confidential information in whole or in part.

After the Cartwrights signed the Agreements, the Weavers announced Gammill's plan to dissolve all its dealerships. Subsequently, Highland Gammill's dealership, as well as all other dealerships, were terminated.

2

Case 6:24-cv-03055-BCW   Document 40   Filed 05/14/24   Page 2 of 14

### B. The Cartwrights' employment with Gammill

Thereafter, Gammill eventually hired the Cartwrights as full-time employees in the fall of 2021. D.C. was first hired as a Technician, was eventually promoted to Sales Director, but then voluntarily stepped down to become a Sales Representative. H.C. started as a Sales Representative and then transferred to Gammill's marketing department. At Gammill's request, the Cartwrights moved from Idaho to West Plains, Missouri in 2022.

As part of their employment, D.C. was given a Gammill-owned computer while H.C. was allowed to use her personal computer to accommodate her preference for using a Mac. As Gammill employees, the Cartwrights had access to Gammill's customer database. While D.C. was a Sales Director, he had the additional[1] ability to export and print the customer database, as well as filter information from it.

In September 2023, the Cartwrights resigned from Gammill and announced their last day of employment would be September 30, 2023.

### C. Gammill's allegations

Gammill alleges that during the Cartwrights' employment and/or since resigning, they engaged in a series of activities that violated their contractual, statutory, and common law duties to Gammill as follows.

While still Gammill employees, Gammill alleges the Cartwrights created direct competitor Everything Longarm, LLC ("Everything Longarm"). Gammill alleges the Cartwrights downloaded trade secrets and other confidential information, including Gammill's customer database during the final months of their employment. Specifically, on August 7, 2023, a few days

---

[1] Gammill employees are given specific logins to access the Customer Database. Each employee is granted unique access and powers depending on their role. Gammill asserts employees are not allowed to share their logins or allow other employees to use their personal login. Gammill further asserts only Gammill directors have the ability to export the Customer Database. (Doc. #7).

before D.C. stepped down as Sales Director, Gammill alleges D.C. provided H.C. with his login credentials, without permission. H.C. then exported the following information from the customer database: (1) a sortable Excel spreadsheet that includes 28,671 current and prospective Gammill customers, (2) a sortable Excel spreadsheet that includes 2,692 of Gammill's active sales leads, and (3) a sortable Excel spreadsheet that includes all individuals who had visited Gammill's website but had not been in contact with Gammill since January 2023 (collectively, "Customer Database Files").

The Customer Database Files were sent to D.C.'s email address and Gammill alleges the Cartwrights later downloaded these trade secrets and confidential information onto their personal devices in August 2023. Gammill alleges the Cartwrights are currently using the Customer Database Files to unfairly compete with Gammill through their company, Everything Longarm.

Gammill also alleges, using the Customer Database files, the Cartwrights impermissibly sent at least two Gammill customers a mass email to further Everything Longarm's marketing efforts. Additionally, Gammill alleges the Cartwrights used its trade secrets and confidential information to secure contracts with Gammill competitors Berina, Handi Quilter, Inc., and APQS.

Apart from Gammill's allegations that Defendants misappropriated its trade secrets and other confidential information, Gammill also argues Defendants violated the nonsolicitation aspect of the Agreements. Specifically, during the Cartwrights' employment with Gammill, Gammill alleges D.C. solicited, and H.C. conspired with D.C. to solicit, Gammill employees to take business away from Gammill. Furthermore, Gammill alleges D.C. made, and H.C. conspired with D.C. to make knowingly false, defamatory, and malicious statements about Gammill to induce Gammill employees to resign from their employment.

4

Case 6:24-cv-03055-BCW   Document 40   Filed 05/14/24   Page 4 of 14

Specifically, Gammill alleges while D.C. was a Sales Director, he promised raises to his direct reports that he knew he was not authorized to make and knew or expected would not occur, and then he told those direct reports that Gammill's General Manager, Michelle Weaver, was unfairly denying them those raises. Subsequently, Gammill employee, Jayden Wiley ("Wiley"), resigned.

Additionally, Gammill alleges that during D.C.'s employment, he told a Gammill employee, Cindy Culbertson ("Culbertson"), that Michelle Weaver was underpaying her and making her job unbearable, while at the same time intentionally manipulating her job performance to compel her to resign. Culbertson subsequently resigned from Gammill and is now working with H.C. on a podcast called "Chatty Quilters". Gammill alleges H.C. supported and affirmed the statements D.C. made and conspired with D.C. to make these false statements about Gammill, to encourage Gammill employees to end their employment with Gammill and work with them instead. To date, Gammill states it has been unable to fill either Wiley's or Culbertson's positions.

### D. The Cartwrights' attempts to hide evidence of their illegal activities

Gammill alleges shortly before he resigned, D.C. attempted to delete evidence of his illegal activities by wiping his company computer clean and reinstalling Windows on his company computer before turning it back in. Gammill further alleges D.C. also transferred ownership of his company Microsoft One Drive account to his personal email address one hour before he submitted notice of his resignation, on September 25, 2023, in order to maintain copies of Gammill's trade secret and confidential information before he lost access to such information. Finally, Gammill alleges the Cartwrights purposefully deleted emails from their company email addresses in an attempt to destroy additional evidence of their illegal activities.

### E. Procedural history

On October 26, 2021, Gammill, through its attorneys, sent a cease-and-desist letter (the "demand letter") to the Cartwrights. On October 31, 2023, the Cartwrights, through counsel, responded denying that they had taken or used Gammill's trade secrets, confidential information, or unfairly competed with Gammill.

Four months later, on February 26, 2024, Gammill filed a verified complaint (the "Complaint") in this Court. (Doc. #1). The Complaint alleges the following claims: Count I, violation of the Defend Trade Secrets Act ("DTSA"); Count II, violation of the Missouri Uniform Trade Secrets Act ("MUTSA"); Count III, breach of contract; Count IV, violation of the Computer Fraud and Abuse Act ("CFAA"); Count V, violation of the Missouri Computer Tampering Act ("MCTA"); Count VI, tortious interference with business expectancy; Count VII, tortious interference with a contract; Count VIII, defamation; Count IX, injurious falsehood; Count X, breach of duty of loyalty; Count XI, breach of fiduciary duty, Count XII, unfair competition; Count XIII, fraudulent misrepresentation; and Count XIV, injunctive relief. Counts I, II, VI, and XIV are alleged against all Defendants, Counts III, IV, V, VII – X, XII, and XIII are alleged against the Cartwrights only, and Count XI is alleged against D.C. only. Also on February 26, 2024, Gammill filed the instant motion for temporary restraining order ("TRO") (Doc. #6).

On March 24, 2024, Defendants filed a verified answer, affirmative defenses, and counterclaims. (Doc. #20). Defendants assert the following counterclaims: Count I, breach of oral contract and Count II, violation of the Missouri Unpaid Commission law.

On April 12, 2024, Gammill filed a verified answer to Defendants' counterclaims and affirmative defenses (Doc. #30). Also on April 12, 2024, Defendants filed their opposition to

6

Gammill's motion for TRO. (Doc. #29). On April 19, 2024, Gammill filed a reply in support of its motion for TRO. (Doc. #32).

On April 23, 2024, the Court heard oral argument on the instant motion. (Doc. #33). The parties did not present any additional evidence beyond the exhibits of record and the Court took the matter under advisement.

## LEGAL STANDARD

Under Fed. R. Civ. P. 65(b), the Court has the authority to issue a TRO to preserve "the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty., 415 U.S. 423, 438-9 (1974). When determining whether to grant a TRO the Court must balance four factors: (1) the probability that movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on either of the parties; and (4) the public interest. Dataphase Sys. v. C L Sys., 640 F.2d 109, 112 (8th Cir. 1981); Tumey v. Mycroft Al, Inc., 27 F.4th 657, 665 (8th Cir. 2022) (the standard for issuance of a TRO or a preliminary injunction are the same). The moving party bears the burden of proving the four factors. Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

## ANALYSIS

Gammill argues application of the Dataphase factors to the underlying action supports issuance of a TRO as follows. First, Gammill argues it will suffer irreparable harm to its business, customer base, competitive position, and goodwill and reputation absent a TRO. Furthermore, Gammill argues that it is likely to succeed on the merits of all 14 of its claims; however, Gammill emphasizes that it need only show that it will succeed on the merits of just *one* of its claims for

this Dataphase factor to weigh in its favor. See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1040 (8th Cir. 2016). Additionally, Gammill argues that the balance of harms weighs in its favor because if the TRO is granted, Defendants will only have to do what they were contractually obligated to do in the first place – i.e. refrain from using its confidential information. Finally, Gammill emphasizes the public interest favors healthy competition and disfavors unfair competition.

In opposition, Defendants argue Gammill cannot demonstrate irreparable harm, which is ultimately fatal to its request for a TRO. See Watkins Inc., 346 F.3d at 844 ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."). Specifically, Defendants emphasize that Gammill inexcusably delayed seeking a TRO until approximately four months after sending its initial demand letter. Defendants otherwise argues the remaining Dataphase factors do not weigh in Gammill's favor. Specifically, Defendants assert: (1) Gammill has not shown a likelihood of success on the merits of any of its claims since Defendants have denied Gammill's allegations in its verified answer and Gammill otherwise lacks evidentiary support for its claims; (2) the balance of harms weighs in Defendants' favor because if the TRO is granted it will essentially put Defendants out of business, and; (3) the public interest does not favor the enforcement of unreasonable restrictive covenants like those contained in the Agreements.

Assuming, for argument's sake, that Gammill demonstrates a likelihood of success on the merits of at least one of its 14 claims, the Court finds that the remaining Dataphase factors do not weigh in favor of a TRO as detailed below.

8

Case 6:24-cv-03055-BCW    Document 40    Filed 05/14/24    Page 8 of 14

### A. Gammill does not demonstrate irreparable harm at this stage of the proceedings.

As mentioned above, Gammill argues absent a TRO it will suffer irreparable harm to its business, customer base, competitive position, and goodwill and reputation. Gammill emphasizes each sale lost is substantial and unrecoverable since customers typically buy just one longarm quilting machine in their lifetime. Thus, to the extent Defendants manage to poach customers from Gammill's customer database, Gammill loses that sale forever including any potential upgrades or servicing that customer would have sought. Finally, Gammill asserts that the Cartwrights' lies have caused at least two employees to resign and it is unlikely Gammill will be able to replace them with employees of similar caliber.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because [the party's] injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (quoting Iowa Utils. Bd. v. Fed. Commc'ns Comm'n, 109 F.3d 418, 425 (8th Cir. 1996)). To this end, failure to seek a TRO in a timely fashion may "vitiate[] much of the force of [a plaintiff's] allegations of irreparable harm." Id. (quoting Beame v. Friends of the Earth, 434 U.S. 1310, 1313 (1977)).

Here, Gammill waited approximately four months between sending its initial demand letter to Defendants, and actually filing the Complaint and the instant motion. In a telephone conference held on March 28, 2024, Gammill stated it delayed filing the instant motion because the original attorney on the case went on parental leave and it took some time to re-staff this matter. Gammill

9

also asserts that after Defendants replied to the demand letter denying its allegations, it had to take additional time to re-investigate its claims and verify its allegations.

Notwithstanding Gammill's explanation, Gammill's delay in seeking a TRO "vitiates much of the force of [its] allegations of irreparable harm." Beam, 434 U.S. at 1313. While the stated reasons for the delay are a reasonable basis for perhaps some delay, whether a 4-month delay is entirely justified is questionable. It is not lost on the Court that Gammill is represented by a national firm with well over 700 attorneys at its disposal. Similarly, even though Defendants denied Gammill's allegations in response to its demand letter, it seems puzzling that Gammill would need an additional 4 months to re-verify the veracity of its claims if the harm complained of was "of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc., 725 F.3d at 895. Consequently, Gammill's delay in seeking a TRO significantly weakens its claim of irreparable harm. Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 603 (8th Cir. 1999) (significant delay "belies any claim of irreparable injury pending trial.").

Additionally, Gammill has not shown that it does not have an adequate remedy at law on the current record before the Court. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987) (citations omitted) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Gammill's primary issue is that, before resigning, the Cartwrights allegedly downloaded Gammill's customer database, currently remain in possession of the Customer Database Files in violation of the Agreements, and currently utilize the Customer Database Files in furtherance of Everything Longarm's selling efforts.

However, in their verified answer, Defendants denied these allegations. (Doc. #20 at ¶ 38). Furthermore, when the Cartwrights began their full-time employment with Gammill, they added

the information from their own customer list to Gammill's customer database. (Doc. #30 at ¶ 26). Whether and to what extent the Cartwrights are currently utilizing the information from their own customer list versus misappropriating the entirety of the customer database including Gammill's confidential information was not further clarified during oral argument. Nor was any additional evidence presented on this issue. Therefore, Plaintiff has not met its burden to show it is entitled to a TRO because the Court is left in a position where it must believe one verified pleading over another verified pleading to find that Gammill has suffered irreparable harm. Watkins, 346 F.3d at 844 (explaining that plaintiff bears the burden of proving all four Dataphase factors).

The Court is in the same position regarding Gammill's claim as to the loss of its two employees, Wiley and Culbertson. In the Complaint, Gammill alleges both employees resigned due to D.C.'s defamatory statements and H.C.'s support of those defamatory statements. See (Doc. #1 ¶¶ 52-58). However, in their answer, Defendants deny that any defamatory statements were made or that they solicited Gammill's employees at all. See (Doc. #20 ¶¶ 52-58). Again, without any other evidentiary support in the record, the Court is forced to choose between two verified pleadings. But because a TRO is "an extraordinary remedy never awarded as a matter of right[]", the Court cannot simply give Gammill the benefit of the doubt. ARC of Iowa v. Reynolds, 559 F. Supp. 3d 861, 873 (S.D. Iowa 2021) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

Finally, Gammill emphasizes that its loss of competitive position, reputation, and goodwill demonstrate irreparable harm; however, it is not clear from the pleadings or oral argument that such losses are distinct from a claim of lost profits – at least not on the current record before the Court. Cf. ISG Tech., Inc. v. Secure Data Techs., Inc., No. 20-CV-03345-SRB, 2020 WL 7389746, at *8 (W.D. Mo. Dec. 16, 2020) (finding irreparable harm had been established where plaintiff

presented "*sufficient* and *substantial* evidence demonstrating the actual and imminent losses it may suffer . . .") (emphasis added); H & R Block Tax Servs. LLC v. Haworth, No. 4:15-CV-00211, 2015 WL 5601940, at *2-4 (W.D. Mo. Sept. 22, 2015) (finding irreparable harm based on the allegations in plaintiff's verified complaint where a default judgment was entered against defendant and all factual allegations in the verified complaint were deemed admitted). Thus, to the extent the losses are not distinct from a claim of lost profits, Gammill does have an adequate remedy at law in the form of monetary damages. Novus Franchising, Inc., 725 F.3d 885 at 895 (citing Gen. Motors Corp., 563 F.3d at 319 (affirming a district court's denial of a preliminary injunction where the district court "did not clearly err" by finding harm from "lost customer relationships was equivalent to a claim of lost profits" and "could therefore be compensated" as money damages)). Accordingly, Gammill's failure to show irreparable harm alone negates issuance of TRO. Watkins Inc., 346 F.3d at 844.

**B. Gammill does not show that the balance of harms and the public interest weigh in favor of a TRO at this stage.**

"The balance of the harms factor calls for the court to balance the harms that would result in the following scenarios: (1) if the [TRO] was improperly denied because plaintiffs prevailed on the merits of the case; and (2) if the [TRO] was improperly granted because defendants prevailed on the merits of the case." Planned Parenthood Minn., N. Dakota, S. Dakota v. Noem, 584 F. Supp. 3d 759, 781 (D.S.D. 2022); see also Dataphase, 640 F.2d at 113. Regarding whether the public interest weighs in favor of a TRO, the Court considers "the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers." Prudential Ins. Co. of Am. v. Inlay, 728 F. Supp. 2d 1022, 1030 (N.D. Iowa 2010).

12

Here, Defendants will suffer the greater harm if the TRO is granted versus the harm Gammill would suffer if the TRO were denied. Specifically, the scope[2] of the requested relief would essentially put Defendants out of business, despite Gammill's arguments to the contrary. As referenced above, the Cartwrights' personal customer list was added to Gammill's customer database such that whether and to what extent Defendants are currently using Gammill's confidential information remains unclear. And even if the Cartwrights are in possession of some Gammill's customer info, Gammill cannot demonstrate irreparable harm as detailed above. Thus, to grant the instant motion would effectively cease all of Defendants' sales unless and until the Court could determine how Gammill's customer database overlaps with the Cartwrights' personal customer list and would require the Court to answer questions such as whether Defendants developed certain customer profiles before, during, or after their employment with Gammill. Conversely, Gammill can continue its business one way or the other. And to date, Defendants have sold just two longarm quilting machines.

Furthermore, the public interest either does not weigh in favor of a TRO at this time, or the factor is neutral in the Court's analysis. Here, Gammill argues the public interest favors fair competition. Indeed, "Missouri courts recognize that public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their good will . . . ." Schott v. Beussink, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997). Yet, also relevant to Missouri's treatment of restrictive covenants is the idea that they "are not enforceable to protect an employer from mere competition by a former employee, but only to the extent that they protect the employer's trade secrets or customer contacts." Sigma-Aldrich Corp.

---

[2] Among other things, Gammill requests an Order restraining Defendants from acquiring, using, or disclosing Gammill's confidential information including "[t]he Customer Database Files and any other information concerning or derived from Gammill's Customer Database . . . ." (Doc. #7 at 32).

13

v. Vikin, 451 S.W.3d 767, 771 (Mo. Ct. App. 2014). Additionally, in an effort to increase employee mobility, the employment law landscape continues to evolve at the state and federal level as to the propriety of restrictive covenants.[3]

At issue here are two NDAs the Cartwrights signed months prior to their full-time employment with Gammill where the Cartwright's understood that the Agreements were signed on behalf of Highland Gammill and not in the Cartwrights' individual capacities. The Agreements restrain both Defendants for a period of 10 years and have no geographical limit. (Doc. #1-2 at § XI). Whether the Agreements are reasonable is a question not yet answered by this Court. See Beussink, 950 S.W.2d at 625-26 (restrictive covenants in employment contracts are reasonable "as to time and space[]" when "enforcement serves the employer's legitimate interests."). Indeed, resolution of this issue is not necessary for purposes of the instant motion because, as earlier referenced, the issue of irreparable harm is dispositive. But suffice it to say that to the extent the Agreements are not reasonable, then they do not weigh in favor of the public interest. In sum, the balance of the Dataphase factors do not weigh in favor of a TRO, therefore, the instant motion is denied. Accordingly, it is hereby

ORDERED Gammill's motion for temporary restraining order (Doc. #6) is DENIED.

IT IS SO ORDERED.

DATED: May 14, 2024 /s/ Brian C. Wimes
JUDGE BRIAN C. WIMES
UNITED STATES DISTRICT COURT

---

[3] See J. Edward Moreno, *F.T.C. Issues Ban on Worker Noncompete*, N.Y. TIMES, https://www.nytimes.com/2024/04/23/business/noncompete-clause-ban.html; Mark S. Goldstein & Noah S. Oberlander, *What does the future hold for restrictive covenant agreements in the U.S.?*, REUTERS, https://www.reuters.com/legal/legalindustry/what-does-future-hold-restrictive-covenant-agreements-us-2021-10-01/; Jessica Mendelson and Emily Stover, *Recent Developments in Employee Mobility, Restrictive Covenants and Trade Secrets 2022*, AMERICAN BAR ASSOCIATION, https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-march/recent-developments-employee-mobility-restrictive-covenants-trade-secrets-2022/